# In the United States Court of Federal Claims

No. 14-214C
(Bid Protest)
(Filed: August 1, 2014)[1]
(Republished August 13, 2014)

* * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| APPLIED BUSINESS MANAGEMENT SOLUTIONS, INC. LLC, | * * * | Post-Award Bid Protest; Corrective Action; Service-Disabled Veteran-Owned Small Business; Termination for Convenience; Reduction in Requirements; Reprocurement As Sole Source 8(a) Set-Aside; FAR 19.804.29; FAR 19.804-2(a); 13 C.F.R. 124.504(a); 13 C.F.R. 124.504(c). |
| Plaintiff, | * * * | |
| v. | * * | |
| THE UNITED STATES, | * * | |
| Defendant, | * * | |
| And | * * | |
| PREMIER MANAGEMENT CORPORATION, | * * * | |
| Intervenor. | * * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

_____

## OPINION AND ORDER ENTERING PERMANENT INJUNCTION
_____

Antonio R. Franco, PilieroMazza PLLC, 888 17th Street, NW, # 1100, Washington, D.C. 20006, for Applied Business Management Solutions, Inc. Alexander O. Levine, and Kathryn V. Flood, Of Counsel, for Plaintiff.

Stuart F. Delery, Robert E. Kirschman Jr., Martin F. Hockey, Jr., James Sweet, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant.

Heather A. James, Whiteford, Taylor & Preston, LLP, 1025 Connecticut Avenue, NW, Suite 400, Washington, D.C. 20036, for Intervenor.

_____

[1] The Court issued this opinion under seal on August 1, 2014, and directed the parties to file proposed redactions by August 7, 2014. The Court publishes this Opinion adopting some of the proposed redactions. Redactions are indicated by brackets "[…]."

**Williams**, Judge.

In this protest Applied Business Management Solutions, Inc. ("ABMSI") challenges corrective action the General Services Administration ("GSA") took in response to two Government Accountability Office ("GAO") protests by Moody's Consulting Services, Inc, ("Moody's). In response to Moody's first protest against an award to ABMSI, GSA represented to GAO that it was taking corrective action by having offerors realign their pricing, and by GSA revising its price analysis report, reevaluating and documenting past performance and making a new best value award determination, if necessary. GSA undertook this corrective action and almost finished it, when approximately nine months later, Moody's filed a second GAO protest claiming GSA failed to complete its corrective action in timely fashion. In fact, GSA had completed much of its corrective action; it had revised its pricing analysis and past performance analyses a month before the second protest was filed, and these re-evaluations did not suggest any error with the original award to ABMSI. Nonetheless, rather than simply present the revised pricing and past performance analyses to the Source Selection Authority to make a best value determination, GSA claimed a budget cut necessitated such a sweeping reduction in requirements that ABMSI's contract no longer met agency needs, thus warranting termination of ABMSI's contract and a sole-source reprocurement.

GSA's invocation of budget-mandated reduced needs to conclude that ABMSI's contract no longer met agency requirements was unsupported by the record and erroneous. ABMSI's contract from the start accommodated a reduction in requirements and could have remained in place without the agency's ensuing conduct—its rush to the Small Business Administration ("SBA") to secure an 8(a) sole-source contract for services that cost more than ABMSI's contract and displaced a competitive award to a service-disabled veteran-owned small business. GSA's conduct was arbitrary, capricious, and anti-competitive, lacked a rational basis, and prejudiced a service-disabled veteran-owned small owned business. As such, this Court declares GSA's sole-source award to Premier Management Corporation ("Premier") null and void, permanently enjoins GSA and Premier from implementing this sole-source contract and orders GSA to complete the corrective action it undertook in response to Moody's protests forthwith.

## Findings of Fact[2]

### The Solicitation

On February 1, 2012, the General Services Administration ("GSA") issued solicitation number GS-11P-12-YA-C-0017 ("original Solicitation") as a service-disabled veteran-owned small business ("SDVOSB") set-aside for "administrative support services" for the Public Buildings Service ("PBS"), National Capital Region for a one-year base period with four one-year options. AR Tab 1 at 6; see also AR Tab 24 at 578. The original Solicitation called for approximately 68 full-time positions to perform services in secretarial and administrative-assistant work categories. AR Tab 1 at 6.

---

[2] These findings of fact are derived from the Administrative Record which includes the declarations incorporated by this Court's Order of April 10, 2014. Additional findings of fact regarding GSA's and SBA's actions to effect GSA's sole-source award are in the Discussion.

Offerors were to submit both a price proposal and a technical proposal. AR Tab 1 at 54 - 57. The price proposal was to include price sheets with the anticipated firm-fixed price contract total for the estimated labor hours as well as prices for each performance year and five-year schedules, accompanied by supporting documentation to permit the Government to determine price reasonableness. Id. at 55. The technical proposal was to detail how the offeror would satisfy the requirements in the Statement of Work including the following:

    a.   The contractor's program organizational structure.
    b.   The contractor's approach to successfully provide services.
    c.   The contractor's Program Manager's plan to fulfill the technical requirements provided in the Statement of Work.
    d.   The name of three past projects performed by the contractor and contact information for a point of contact for each project.

AR Tabs 56-57.

Award was to be made to the offer deemed "most advantageous to the Government, price and other factors considered." AR Tab 1 at 58. The factors of Technical and Management Approach and Past Performance were deemed to be of "equal importance," and an evaluation rating of unacceptable in any factor would render that offeror ineligible for award. Id.; AR Tab 18 at 512. The Solicitation stated that the combined evaluation of technical and past performance was significantly more important than price. AR Tab 1 at 58.

Each factor was to be evaluated against performance standards, given a rating with a rationale, and evaluated according to risk level, strengths, weaknesses, and deficiencies.

Past performance ratings were to be based upon the following factors:

    (i)       Program organizational structure;
    (ii)      Approach for providing services successfully;
    (iii)    Project manager approach to fulfill the technical requirements identified in the Statement of Work;
    (iv)    Effectiveness in integrating subcontractors within the team's management structure;
    (v)     Approach for project status and price;
    (vi)    Approach for issues management and resolution;
    (vii)   Approach for quality control assurance methods to ensure that the work performed meets the technical requirements of this contract and the proposed solution for desired outcomes;
    (viii)  Approach to transition in and transition out of services to achieve a seamless continuity of operations.

Id. at 56.

The Solicitation required past performance reports for three projects performed within the last five years by the entity that would perform the work. AR Tab 1 at 57. The three projects had to be similar in size, scope and complexity to the requirements in the Solicitation. Id. GSA

issued an Amended Solicitation effective February 15, 2013, that changed the performance periods, reduced the number of personnel needed from 68 to 61, and altered the language in the "Terms that Affect Price" clause.  AR Tab 11 at 239.  The Amended Solicitation reduced this requirement to two projects and specified that if subcontractors or joint ventures had been involved in a project, then the entity that performed one of the two projects had to be the entity that performed the work.  AR Tab 10 at 178.

The original Solicitation contained a paragraph entitled "Terms That Affect Price," stating:

> The Government is in the process of re-organizing its resources.  This may affect its ability to absorb (increase or decrease) Services.  For example, the need may change to fewer FTEs.  Thus, the Government reserves the right to award all or fewer than all of Contractor FTEs on any of the contract line items.  In addition during any performance period, such adjustments or changes occur by modification to the contract.

AR Tab 1 at 14.

In the Amended Solicitation, the "Terms That Affect Price" paragraph provided:

> The Government is in the process of re-organizing its resources.  As a result, the actual number of positions may change prior to award of the contract.  Thus, the Government reserves the right to award for all or fewer than all of the number of positions designated on the contract line items in the pricing tables.  The Government reserves the right to reallocate Contractor resources within the specified number per labor category from one organization to another.  Any reallocation does not change the total number of hours or the total number of positions.

AR Tab 10 at 134.

### Evaluation and Award

GSA received 66 offers, including those from ABMSI, Moody's, and Premier.  AR Tab 15 at 432-44; Tab 16 at 457.  ABMSI and Moody's technical proposals were both rated **[…]**.  Id.

GSA rated ABMSI's past performance **[…]** and Moody's past performance **[…]**.  AR Tab 15 at 446-47; AR Tab 16 at 470.  There was **[…]** for ABMSI's past performance rating.  Id. The breakdown of ABMSI's and Moody's ratings according to each past performance evaluation factors were as follows:

| Past Performance Evaluation Factors | ABMSI's Ratings | Moody's Ratings |
|---|---|---|
| (1) Program organizational structure | **[…]** | **[…]** |

| | | |
|---|---|---|
| (2) Approach for providing services successfully | **[…]** | **[…]** |
| (3)  Project manager approach to fulfill the technical requirements identified in the Statement of Work | **[…]** | **[…]** |
| (4) Effectiveness in integrating subcontractors within the team's management structure | **[…]** | **[…]** |
| (5) Approach for project status and price | **[…]** | **[…]** |
| (6) Approach for issues management and resolution | **[…]** | **[…]** |
| (7) Approach for quality control assurance methods to ensure that the work performed meets the technical requirements of this contract and the proposed solution for desired outcomes | **[…]** | **[…]** |
| (8) Approach to transition in and transition out of services to achieve a seamless continuity of operations | **[…]** | **[…]** |

AR Tab 15–17.

ABMSI's **[…]** rating was based upon its submission of projects that were **[…]**, which led GSA's Technical Evaluation Team to conclude that ABMSI **[…]**.  AR Tab 16 at 470.

GSA attempted to contact Moody's references multiple times to no avail, and this lack of information led to a **[…]** rating.  AR Tab 15 at 447.  GSA noted the following regarding Moody's past performance:

**[…]**

See AR Tab 15.

The evaluation team's rationale for Moody's **[…]** Performance Confidence Assessment was:

**[…]**

AR Tab 15 at 447.

GSA determined that Moody's posed a **[…]** due to its submission of projects **[…]**.  AR Tab 15 at 446-47.

The average hourly rates and contract values for each offer were as follows:

| Position | ABMSI | Moody's |
|---|---|---|

| Secretary-I | $[...] | $[...] |
|---|---|---|
| Secretary-II | $[...] | $[...] |
| Secretary-III | $[...] | $[...] |
| Administrative Assistant-I | $[...] | $[...] |
| Project Manager | $[...] | $[...] |
| Total Value of Contract | $[...] | $[...] |
| Adjusted Contract Value | $[...] | $[...] |

AR Tab 19 at 527.

The original Solicitation provided for performance in the following phases:

1) Phase 1: March 1, 2012 - February 28, 2013
2) Phase 2: April 1, 2012 - February 28, 2013
3) Phase 3: October 1, 2012 - February 28, 2013

AR Tab 1 at 8-9.

GSA provided the following response to an offeror's question regarding whether the periods of performance in the original Solicitation were accurate:

> Response 02. No, but the POP [period of performance] dates . . . will be corrected to read as follows:
>
> Mar 1, 2012 thru Feb 29, 2013, Phase I Base Year
> Apr 1, 2012 thru Feb 28, 2013, Phase II Base Year
> Oct 1, 2012 thru Feb 28, 2013, Phase III, Base Year
> Mar 1, 2013 thru Feb 28, 2014, Option I Year
> Mar 1, 2014 thru Feb 28, 2015, Option II Year
> Mar 1, 2015 thru Feb 29, 2016, Option III Year
> Mar 1, 2016 thru Feb 28, 2017, Option IV Year
> We intend to issue an amendment with a corrected and updated, revised RFP.

AR Tab 6 at 94.

GSA also provided the following response to an offeror's question regarding the purpose of having three phases in the base year:

6

Response 5 (c)  The incumbents provide services under a multiple award contract with task orders outstanding.  These task orders have different end of performance periods.  The base year Phases begin upon the expiration of the task orders.  Phase I starts when task orders(s) expire.  At Phase I, the Government has a need for 42 Contractor Resources (CRs).  Please note this CR requirement in the Price Sheet for Phase I.  Correspondingly, for Phase II and III, note requirements in the Price Sheets.

AR Tab 6 at 95.

The original Solicitation provided for 68 employees during the base year (March 1, 2012 – February 28, 2013) encompassing all three phases.  AR Tab 1 at 8-9.  However, the Amended Solicitation called for 61 employees during the base year according to these phases:

1)  Phase 1:  March 1, 2012 – February 28, 2013
2)  Phase 2: April 1, 2012 – February 28, 2013
3)  Phase 3:  October 1, 2012 – February 28, 2013
4)  [Base Year All 3 Phases]:  March 1, 2012 – February 28, 2013

AR Tab 11 at 233-39.

GSA created a Price Analysis Report to ensure that offered prices were fair and reasonable.  AR Tab 19 at 522.  This report was signed on August 14, 2012, by GSA's Contracting Officer, Elaina Walker and Senior Contract Specialist, Lily Thompson.  Id.  The prices of 23 out of 66 offers were found to be fair and reasonable, including those of ABMSI and Moody's.[3]  Id. at 524.  Of the reasonably priced offers, Moody's was the **[…]** least expensive and ABMSI, the **[…]** least expensive.  Id. at 527.

On August 24, 2012, GSA issued a Price Negotiation Memorandum concluding that **[…]**.  AR Tab 20 at 531.

GSA's Contracting Officer, Elaina Walker and Senior Contract Specialist, Lily Thompson explained:

**[…]**

AR Tab 20 at 531.

GSA adjusted offerors' pricing at the time of the award (which was delayed several months), in order to ensure consistency with hours in the new periods of performance but did not make any changes to offerors' rates.  AR Tab 19 at 525.

---

[3]  GSA received 66 offers, but two offerors withdrew their proposals before the Source Selection Team evaluated them.  AR Tab 19 at 522.  **[…]**.  AR Tab 19 at 524-25.

On August 24, 2012, GSA awarded Contract number GS-11P-12-YA-C-0017 ("Contract 0017") to ABMSI for a base-year price of $**[…]**.  AR Tab 21 at 534.  Assuming the exercise of all option years, ABMSI'S award amount was $**[…]**.  AR Tab 21 at 534.  Moody's base year price was $**[…]**.  AR Tab 26 at 600.  That same day, GSA notified Moody's of the award but sent the notification to an incorrect email address.  AR Tab 24 at 575-76.  On September 4, 2012, Moody's emailed the contract specialist inquiring about the status of the award.  AR Tab 23 at 572.  The following day GSA responded as if this inquiry had been a request for a debriefing, and sent the Notice of Award to Moody's correct email address.  Id. at 572-73, see also AR Tab 24 at 577.  ABMSI began performance on September 1, 2012.  AR Tab 10.  GSA exercised ABMSI's option for year 1, which began on September 1, 2013.

**Moody's Original GAO Protest**

Eight months later, on April 5, 2013, GSA sent Moody's a written debriefing.  AR Tab 26 at 596.  The debriefing explained the rationale for the award to ABMSI and detailed how GSA arrived at Moody's readjusted pricing stating:

> Due to the six month delay in the contract award, the government combined both the Phase 1 and Phase 2 periods of performance for the first 12 months into one Phase 1.  In addition, the original Phase 3 period of performance was changed from six months to 11 months accordingly.  Based on the same hourly rates, the original base year amount adjusted from $**[…]** by $**[…]** to $**[…]** and, thus, this same adjustment changed the grand total amount from $**[…]** to $**[…]** (adjusted grand total).  The adjusted grand total amount is $**[…]**or **[…]**% lower than that of the Awardee amount.

AR Tab 26 at 600.

On April 9, 2013, Moody's filed a protest with GAO, alleging that the past performance evaluation and price adjustment were improper.  AR Tab 27.  Moody's claimed that its two submitted projects exceeded the requirements in the Solicitation, stating that the "complexity of the administrative aspect of the Fort Dix contract alone outweighs the administrative support required" by this Solicitation.  Id. at 607.

Specifically, Moody's stated:

> The Agency-GSA adjusted Moody's proposal price and lowered ABMSI's proposal price unbeknownst to Moody's and other offerors after the initial award notification letter of August, 24, 2012.  This willful action on the part of the Agency-GSA gave ABMSI a decidedly unfair selection advantage.

Id. at 604.

Moody's protest continued:

In the debrief letter, GSA increased our price proposal because of the six month delay in the contract award yet they did not increase the price proposal of the awardee, ABMSI.   GSA stated the Government combined both the Phase 1 and Phase 2 periods of performance for the first 12 months into one Phase 1 period . . .

The Government is in error in the pricing adjustment calculation for Moody's by changing the Phase 3 period from 6 months to 11 months.   In doing so, Moody's original total price increased by $**[…]** or **[…]**% to an award value amount of $**[…]**.   If the Government applied the same cost analysis on awardee ABMSI's original award value of $**[…]** . . . then ABMSI's adjusted price would be $**[…]** or a **[…]**% increase.

Id. at 608.


Moody's claimed that the award to ABMSI was unfair and resulted from a "false rationale for the award based on the best interest of the Government to pay a higher premium." Id. at 609.   Three days later, on April 12, 2013, GSA issued a stop-work order on Contract 0017 and notified ABMSI of Moody's protest.  AR Tab 28 at 611.

On May 2, 2013, 23 days after the protest was filed, GSA informed GAO that in response to Moody's protest it had decided to take corrective action and requested that GAO dismiss Moody's protest stating:

[The agency] intends to properly document the past performance (PP) evaluation results for both [ABMSI] and [Moody's]; request that both ABMSI and Moody's re-align their respective pricing to map with the actual contract award date and subsequent performance periods; revise the price analysis report based on the re-aligned pricing submitted; and lastly revise the Best Value Determination (BVD) based on the supplemental PP evaluation, re-aligned pricing submitted and the supplemental price analysis of the re-aligned pricing.  GSA will ensure that the evaluation is performed in accordance with the stated criteria and is properly documented.

AR Tab 30 at 623-24.

On May 3, 2013, GAO dismissed Moody's protest as moot.  AR Tab 40 at 835.  On May 7, 2013, GSA cancelled the stop-work order and directed ABMSI to resume work.  Compl. Ex B at 1.

## GSA's Corrective Action and Reduced Requirements

GSA began undertaking corrective action in early May, 2013.  AR Tab 30 at 623.  On May 16, 2013, GSA requested that ABMSI and Moody's submit realigned pricing by May 17, 2013, and both complied.  AR Tabs 31-34.  Realigning prices required each offeror to complete a price table, change its proposed prices to reflect new contract performance periods, and include hourly rates for each labor category.  AR Tab 31 at 625.

On August 6, 2013, GSA's Contracting Officer Representative Calvin Dawes, emailed Clair Fortune, Director of GSA's Office of Organizational Resources, Contracting Officer Elaina Walker, and Airis Gill, GSA's Deputy Director of Office of Organizational Resources, stating:

> I gave Elaina a heads up about the possibility that the ABMSI contract may be downsize[d] in the number of people for option year 1, as much as 25%-50%. Elaina would like to have a confirmation by the end of this week so she can inform the contractor.

AR Tab 46 at 854.

On August 7, 2013, ABMSI's Chief Operating Officer, William H. McGlockton II, met with Calvin Dawes.  Pl.'s Mot. For Leave to Suppl. the AR Ex. B, McGlockton Decl. ¶ 4.  Mr. Dawes told Mr. McGlockton "that GSA was planning on rescaling ABMSI's Contract by anywhere between 25-40%, but that such modification might not be implemented before the exercise of ABMSI's Contract option on September 1, 2013."  Id.

According to the affidavit of Mr. McGlockton, a week later, on August 14, 2013, GSA's Contracting Officer, Elaina Walker, notified Mr. McGlockton that:

> GSA had intended to reduce the contract at the execution of Option Year 1, but [] the requisite planning and documentation had not been completed and she did not want to disturb contract operations given the earlier protest shutdown.  Instead, Ms. Walker conveyed that the GSA intended to exercise ABMSI's first option year period at full staffing levels, but that reductions in staffing were inevitable by the execution of option year two and that ABMSI should take appropriate steps to advise and prepare its staff for cuts equaling 25-40%.

Id. at ¶¶ 5-6.

Contracting Officer Walker recalled that during this conversation she told Mr. McGlockton that:

> GSA would exercise the first year option. However, [she] cautioned Mr. McGlockton that the Government was experiencing budget cuts, which meant that we would have to downsize the number of administrative support staff by the execution of option year two.  Mr. McGlockton responded to [her] indication that there would be a reduction in requirements by indicating that he would discuss with his employees that they must ensure they are performing their best.

First Walker Decl. ¶ 4.

Contracting Officer Walker continued:

> [She] did not guarantee or promise Mr. McGlockton that the contract would remain with ABMSI at that time, or at any other time.  Nor did [she] indicate that

[she] planned on securing the reduced requirements under the existing 0017 contract during the second option year.  [She] was not certain what the exact size of the reduced requirement would be at that time.

Id. at ¶ 5.

## GSA's Corrective Action and Legal Review

On August 28, 2013, as part of the corrective action, GSA's Past Performance Team completed its first draft of the past performance analysis and submitted it for legal review.  AR Tab 35.  The Past Performance Team rated ABMSI's past performance as [...], and rated the overall past performance of Moody's as acceptable with [...].  Id. at 687, 693-94.  The same day, Contracting Officer Elaina Walker submitted to agency counsel GSA's conclusion that the prices submitted by both ABMSI and Moody for the new contract performance periods were [...].  Id. at 739.

This rating was based on ABMSI's [...] by GSA's evaluator as well as its [...] overall rating by its references.  Id. at 687.  [...]  Id. at 684.  The Past Performance Team found [...] to be [...].  Id. at 684-87.  [...].  Id.

The Past Performance Team explained that its [...] rating for Moody's was due to [...].  Id. at 693.  Moody's had submitted [...] for past performance evaluation.  Id. at 690-92.  Project 1 [...], project 2, [...].  Id.  The [...] the scope of this Solicitation, but only project 1 [...].  Id. at 690-91.  [...] involved [...] and represented a contract worth only [...]% of the amount of the 0017 contract.  Id. at 691.  [...] was found to be [...] in size, scope and complexity to this Solicitation involving [...].  Id. at 692.  The Team concluded that it had [...] that an administrative services contract would be successfully performed by Moody's.  Id. at 693.

On September 5, 2013, GSA's counsel identified errors in the Past Performance Team's report, including its [...].  AR Tab 36 at 695-717.  That same day, GSA's counsel advised the Past Performance Team to revise the draft to address her concerns and stated:

[...]

Id. at 695.  Counsel noted that [...].  Id. at 701.

On November 4, 2013, the Past Performance Team submitted its second Past Performance analysis report to GSA's counsel for review, again rating ABMSI as [...] and Moody's as [...].  AR Tab 37 at 747, 752, 754-55.  In the second revised past performance report, counsel's concerns regarding the [...] were largely addressed.  See AR Tab 36.  As counsel had directed, the second draft contained information that had been lacking in the prior draft, including [...].  AR Tab 37 at 753.

The second draft report stated:

[...]

Id. at 747.

On November 13, 2013, GSA's counsel provided her review of the second Past Performance Team evaluation report.  AR Tab 38 at 772, 782.  Specifically, in regard to Moody's past performance, counsel commented that the Past Performance Team [...].  Id. Counsel also suggested substituting her own ratings in lieu of those compiled by the Past Performance Team, inserting: [...] next to what had been Project 1's [...] rating, [...] for Project 2's [...], and [...] for what had been Project 3's [...].  Id. at 778-81.

Counsel determined that an overall rating of [...] for Moody's second project, which involved transportation services from an employee parking lot to a Veteran Affairs Medical Center, was inconsistent with the evaluators' finding of [...] and had to be reversed.  Id. at 785.  In addition, counsel wrote the following: [...].  AR Tab 38 at 772.  Counsel also questioned the Past Performance Team's conclusions as to evaluations for ABMSI and Moody's throughout the draft and directed the team to revise the draft.  Id. at 775-77.

On December 12, 2013, the Past Performance Team submitted a third more detailed report analyzing ABMSI's and Moody's past performance which maintained the same overall ratings.  AR Tab 39 at 812-13.  This report included rationales for each rating, in response to counsel.  AR Tab 38-39.

Although the Past Performance Team was [...], the 10-page consensus report was deemed finished and had been submitted to the Source Selection Authority, Ms. Walker, for her decision.  Tr. 104-06, May 14, 2014.  The sole action remaining to complete GSA's corrective action as of December, 2013, was for the Source Selection Authority to make an award decision. Id. at 103-06.  Despite completing both the third past performance evaluation report and the adjustment for realigned pricing—the totality of corrective action addressing Moody's protest of the award to ABMSI—the agency did not make an award.  The record does not indicate what activities, if any, GSA undertook to complete corrective action after December 12, 2013.

**Moody's Second GAO Protest and GSA's Offer to Settle**

On January 29, 2014, Moody's filed a second GAO protest claiming that GSA failed to complete its corrective action in a reasonable and timely manner.  AR Tab 40 at 834; see also AR Tab 44 at 846.

Three business days after Moody's filed its second protest, on February 3, 2014, GSA offered to settle this protest by paying Moody's protest costs.  AR Tab 44 at 846.  On February 11, 2014, GSA's Contracting Officer, Elaina Walker and Contracting Director, Melanie Lewis, signed a document titled "Limited Acquisition Plan Project Information" stating that:

> [T]his contract was previously awarded as an Administrative set-aside as a Small [Disabled] Veteran Owned Small Business.  However, due to agency budgetary commitments to reduce the level of internal contractor support, our support needs were changed therefore resulting in the need to reprocure Administrative Support Services.

AR Tab 66 at 947.  The "Limited Acquisition Plan Project Information" does not identify what "agency budgetary commitments" necessitated a reprocurement.  Id.

On February 18, 2014, Moody's rejected GSA's settlement offer.  AR Tab 44 at 846. Eight days later, on February 26, 2014, GSA's counsel sent a four-page letter to GAO, recounting the background to Moody's second protest stating:

(i) subsequent to Moody's protest on April 10, 2013, GSA communicated to GAO its intent to take corrective action by "re-evaluating and properly documenting the past performance submissions of both Moodys and ABMSI", that both companies were requested to re-align their pricing to reflect the "contract periods based on the award date;"

(ii) if necessary, GSA would make a new best value award determination based on the results of price re-evaluations;

(iii) Moody's first bid protest had been dismissed as moot on May 3, 2013.  AR Tab 44 at 845.  GSA's counsel continued that GSA had not completed corrective action but that "as a result of budget cuts" it was in the process of "re-defining its administrative support requirements."  Id.

GSA's letter continued:

On January 29, 2014, Moodys protested to GAO that GSA has failed to complete in a reasonable and timely manner the proposed corrective action.  On February 3, 2014, GSA made an offer to the protester to settle the protest by agreeing to pay the protester's costs of filing and pursuing the protest.  On February 18, 2014, the protester declined the agency's offer of settlement.  A status conference was held on February 20, 2014.  During the conference, GSA's progress in executing the corrective action and the absence of a stay of performance was discussed.

Accordingly, as evidenced by the attached termination notice to ABMSI, GSA has decided to terminate the protested contract.  GSA is preparing a new solicitation to include any necessary updates/reductions to its requirements.  The corrective action identified is necessary in order to update the requirements and to resolve issues brought to light by the original protest.

AR Tab 44 at 846 (internal citations omitted).  The referenced "issues brought to light by the original protest" were not identified.

In its February 26, 2014 letter to GAO, GSA further stated:

In this case, there is no evidence that the protest was clearly meritorious.  The agency initially undertook the May 2, 2013 stated corrective action in order to properly document the past performance evaluation results and to have the contractors, rather than the contracting officer, re-align the prices proposed.  The

need to properly document the evaluation results does not establish that the protest was clearly meritorious.  In addition, during the corrective action process, due to budget cuts, GSA undertook a re-assessment of its administrative support needs and concluded that the level of support contained in the ABMSI contract no longer reflected its needs.  Here, the termination of the contract awarded to ABMSI is primarily necessary due to the fact that the awarded contract no longer reflects the agency's needs.

In addition, GSA took corrective action in a reasonable and timely manner.  In response to the initial protest, GSA promptly undertook the corrective action indicated in its May 2, 2013 notification to GAO and to the protester.  Furthermore, concurrently with the corrective action efforts, GSA was forced to re-assess its administrative support requirements due to budget cuts.  As a result, it has been determined that the contract awarded to ABMSI no longer represents the agency's needs and will be terminated in accordance with the attached notice.  Therefore, we respectfully request that GAO dismiss the protests as the corrective action makes this protest moot / academic.

Id. at 847.

GSA's referenced "reassessment of its administrative support needs" that led to its conclusion that "the level of support in the ABMSI contract no longer reflected its needs" is not documented.  That same day, February 26, 2014, GSA's Contracting Officer Elaina Walker issued a stop-work order to ABMSI, effective March 21, 2014, noting that the contract was being terminated for the Government's convenience.  Compl. Ex. D at 1.[4]

**GSA's Sole-Source Offer Letter to the Small Business Administration**

The day after its notice of corrective action to GAO, on February 27, 2014, GSA sent a two-page offer letter to the SBA requesting that SBA accept the administrative support services requirement being fulfilled by ABMSI into SBA's 8(a) Program as a sole-source award.  AR Tab 68 at 962.  The letter characterized the sole-source award as "a follow up contract to an administrative support services for the Public Building Services at National Capitol Region . . . being terminated for government convenience effective March 14, 2014" and identified Premier Management Corporation as a potential contract awardee. AR Tab 76 at 1101 (stating that GSA "proposes to award a contract on a sole source basis under the Section 8(a) program and has identified Premier Management Corporation) as a potential source for a contract award."); see also AR Tab 68 at 962.  The letter stated:

9.  No solicitation for the specific acquisition has been issued indicating this requirement as a small business, HUBZone, service-disabled veteran-owned small business set-aside, nor a set-aside under the Women-Owned Small Business (WOSB) Program, etc., nor has this requirement been publicly announced.

---

[4]  The contract is currently being performed by ABMSI at original requirement levels because ABMSI and GSA entered into a stay pending the Court's decision in this action.

10.  No particular 8(a) concern designated for consideration

12.  No other 8(a) concerns possessing the direct relevant experience performing the types of economic analyses cited in the SOW have expressed an interest in being considered for this requirement.

13.  No request that this requirement, value estimated under the competitive threshold, be awarded as an 8(a) competitive contract.

14.  GSA request that this requirement be awarded as a sole source contract in accordance with the GSA/SBA Partnership Agreement.

15.  No other pertinent and reasonably available data.

AR 68 at 962-63.[5]

## SBA's Acceptance of the Sole Source 8(a) Set Aside

On Thursday, March 13, 2014, at 12:44 p.m. SBA's 8(a) Business Opportunity Specialist, Christine Kingston, emailed GSA's Contract Specialist, Theophilus Hlovor, asking for additional information to process GSA's February 27th request for a sole-source set aside namely, (1) the original offer letter, (2) the statement of work, and (3) the acquisition history, including the firm currently performing the work.  AR Tab 78 at 1112.  Two hours later, Contract Specialist Hlovor responded via email that "Below is the original letter sent and the statement of work. The incumbent is not an 8a firm.  It is a service-disabled veteran own[ed] small business.  It was competed with 61 vendors participating.  The name is ABMSI . . . ." Id. at 1113.  The original letter and Statement of Work do not appear as an attachment in the AR and no additional documents appear to be attached to this email.  Id.

Twenty-five minutes later SBA sent GSA its letter of acceptance, via email, for the sole source set-aside, stating that Premier met all the requirements to fulfill the contract.  AR Tab 77 at 1103.  SBA stated:

This letter is to serve as acceptance of the offer submitted by your agency on March 13, 2014 . . . on behalf of . . . Premier Management Corporation

\* \* \*

The estimated dollar value of this procurement (including all options) will be $**[…]**.  The assigned NAICS Code is 541611, with a corresponding size standard of $14,000,000.00.  Our acceptance is certification of the named firm's eligibility to receive the above referenced requirement.

_____

[5]  The Court quotes GSA verbatim; errors have not been corrected in any quoted GSA correspondence.

We have conducted an analysis of this requirement in accordance with the provisions set forth in Title 13 of the Code of Federal Regulations (13 C.F.R. § 124.504(c)), Adverse Impact.

The results of the analysis revealed that:

(1) No small business performed this requirement for at least 24 months;

(2) No small business was performing the requirement at the time this requirement was offered to the 8(a) BD [Business Development] Program, or the small business' performance of the requirement ended within 30 days of the procuring activity's offer of the requirement into the 8(a) BD [Business Development] Program;

(3) and the dollar value of the requirement that the small business is or was performing does not constitute 25 percent or more of its most recent annual gross sales (including those of its affiliates) . . . the acceptance of this requirement . . . will have no adverse impact on an individual small business, a group of small businesses located in a specific geographical location, or other small business programs.

AR Tab 77 at 1103.

That same day, March 13, 2014, GSA notified Premier it was awarded Contract No. GS-11P-14-YA-0018 ("0018") on a sole source basis in the amount of $**[…]**, for 43 management support personnel to work from March 24, 2014 until December 31, 2014.  AR Tab 81 at 1127; see also AR Tab 77 at 1105.  In the original procurement Premier's bid price was $**[…]** more than ABMSI's, and its past performance was found to be **[…]** with a **[…]** and to present a **[…]** risk factor to the Government.  AR Tab 17 at 485-86.

**Procedural History**

On March 14, 2014, ABMSI filed the instant protest requesting the Court to enjoin the termination of its contract and the sole-source award to Premier.  Compl. 1-2, 9-10.  The parties agreed to a voluntary stay commencing on March 17, 2014, to delay the March 21, 2014 effective termination date of ABMSI's Contract 0017 to enable the Court to resolve the protest.  On March 19, 2014, GSA's CO issued a stop-work order to Premier on contract 0018 until June 4, 2014.  AR Tab 82 at 1161.  The Government extended the stay until August 1, 2014.

At oral argument on cross motions for Judgment on the AR, the Court ordered that the Government produce documents relating to its claim that the agency had a 34-percent budget reduction for this requirement.  On May 19, 2014, the Government filed Exhibits B, C, D, and asserted that these documents "confirm[ed] the need to reduce administrative staff, what the reductions would be and how that would impact [the ABMSI contract]."  Notice of Filing (May 19, 2014).  Exhibit B is a memorandum dated November 7, 2011, from the Executive Office of the President that directs agencies to reduce their administrative support staff by 15 % during FY

2012.  Exhibit C is an email dated July 15, 2013, from Claire Fortune, GSA's Deputy Office Director of the Office of Leasing to several GSA employees.[6]  The email includes a table describing GSA's financial outlook for FY 13, 14, and 15.  The entry for FY 14 calls for "a mandated reduction by [Contracting Officer] of 34%" and notes that "[w]e are asking for additional details and clarification."  Exhibit C does not list any specific contracts but states that "[i]n order to see where we can reduce based upon the Central Office mandate, you will need to validate and prioritize your respective contractors", giving each contractor a rating 1, 2, or 3.  1 to signify "keep," 2 to signify "maybe" keep, 3 to signify "immediate reduction."  Exhibit D is a spreadsheet with column headings titled, "Business Line Supported," "Role/Position," "Company," "Contract Number," "PDN," "Part Time or Full Time," "Proposed FY 2014 Obligation," "Proposed FY 2015 Obligation," "Rating," "Expiration Date," "Reduction Category," "10% Rating," "Change," "Spend Tracker Status," and appears to contain the ratings "1," "2," and "3" in each row with an employee's name.  Notice of Filing, Exh. D. (May 19, 2014).  The Government acknowledged that the record did not contain any document that explained what Exhibit D was, who prepared it, or when it was prepared.  Tr. 20, June 11, 2014.

Neither party requested that the AR be supplemented with Exhibits B - D.  Id. at 8-25.  In Plaintiff's view, Exhibits B, C, and D, raised more questions than they answered and did not establish GSA's reduced budget requirements or explain the impact those requirements would have on the ABMSI contract.  Id.  When the Court asked the Government whether there were any additional documents addressing the budgetary constraints described by the Government, counsel for the Government stated that according to GSA counsel, Exhibits B and C were the "only documents related to that fiscal year (FY 2014)" that she could locate.  Id. at 19.

### Discussion

### Jurisdiction and Standard of Review

The Tucker Act confers jurisdiction on this Court "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2012).  "Standing is a question of subject matter jurisdiction . . . ."  Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013) (citing S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 n.3 (Fed. Cir. 2005)).  Plaintiff "bears the burden of establishing [the] elements [of standing]" because it invokes this Court's jurisdiction.  Myers Investigative & Sec. Servs. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (alterations in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

The Tucker Act instructs this Court that in any action under §1491(b)(1), the court shall review the agency's decision pursuant to the standards set forth in the Administrative Procedure Act ("APA").  The APA states that the "reviewing court shall-- . . . (2) hold unlawful and set

---

[6]  The end of the email contains the signature block of GSA's Eitan S. Naftali, of the Office of Organizational Resources.

aside agency action, findings, and conclusions found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

Agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., 586 F.3d at 1375 (alteration in original) (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

This Court will review the basis for the agency decision to determine if it was "legally permissible, reasonable, and supported by the facts." FNC Inc. v. United States, 115 Fed. Cl. 335, 361 (2014). To review the reasonableness of an agency action, "'[c]ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.'" Atar S.R.L. v. United States, 730 F.3d 1320, 1325 (Fed. Cir. 2013) (quoting Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369 (Fed. Cir. 1998)). A court will overturn an agency's decision as arbitrary and capricious if it "entirely failed to consider an important aspect of the problem." FNC, 115 Fed. Cl. at 364 (quoting SFK USA Inc. v. United States, 630 F.3d 1365, 1374 (Fed. Cir. 2011). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." In re Sang-Su Lee, 277 F.3d 1338, 1344 (Fed. Cir. 2002) (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43); FNC, 115 Fed. Cl. at 363 (citing WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001)) (citations omitted).

An agency remains obligated to develop an evidentiary basis for its findings. FNC, 115 Fed. Cl. at 368 (citing Sang Su Lee, 277 F.3d at 1344). "'The grounds upon which an administrative order must be judged are those upon which the record discloses that its actions are based.'" Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States, 701 F.3d 1367, 1377 (2012) (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).

In resolving bid protests, the trial court is to make findings of fact weighing the evidence in the Administrative Record. See Bannum, Inc. v. United States, 404 F.3d 1346, 1355 (Fed. Cir. 2005). If the court finds that the Government's conduct fails the APA review, then it proceeds to determine as a factual matter if the bid protester was prejudiced by that conduct. Id. at 1351; see also Afghan Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714, 723 (2012).

To obtain a permanent injunction a party must show that: (1) it has succeeded on the merits; (2) it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest. See FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993); Gentex Corp. v. United States, 58 Fed. Cl. 634, 654 (2003); Hawpe Constr., Inc. v. United States, 46 Fed. Cl. 571, 582 (2000) aff'd, 10 Fed. Appx. 957 (Fed. Cir. 2001). No one factor is dispositive, and "the weakness of the showing regarding one factor may be overborne by the strength of the others." FMC, 3 F.3d at 427.

**Plaintiff Has Standing**

ABMSI challenges GSA's corrective action taken in response to Moody's two GAO protests. Here, GSA's corrective action embodied three agency actions—1) the abandonment of the corrective action that GSA had represented to GAO it was undertaking, (even though the reevaluation had been completed), 2) the termination of AMBSI's contract due to a reduction in needs (even though ABMSI's contract was expressly able to accommodate such reduction), and 3) a reprocurement of the same services covered by ABMSI's contract in the form of a sole-source 8(a) award.

This Court has well established jurisdiction over corrective action in a bid protest. Chapman Law Firm v. United States, 490 F.3d 934, 938 (Fed. Cir. 2007) (finding jurisdiction to review corrective action taken by an agency); see generally Centech Grp., Inc. v. United States, 554 F.3d 1029 (Fed. Cir. 2008) (affirming a decision by the Court of Federal Claims in a bid protest challenging corrective action taken to implement GAO recommendation). The Federal Circuit has "made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented." Sys. Application & Techs. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (citing Turner Constr. Co. v. United States, 645 F.3d 1377 (Fed. Cir. 2009)) (finding jurisdiction over a bid protest brought by an awardee after the Army terminated the awardee's contract and announced its decision to follow GAO's recommendation to re-compete).

Even though Plaintiff has lodged a bid protest challenging corrective action which is well recognized as being within this Court's jurisdiction, Defendant isolates one aspect of the corrective action, the termination of ABMSI's contract, and contends that GSA's termination was contract administration not subject to this Court's bid protest review. Technically, termination of a contract may be characterized as contract administration subject to challenge under the Contract Disputes Act. But that does not mean that where such termination is taken as part of a larger corrective action in the contract-formation context, it is shielded from bid protest review. Here, the termination is a component of GSA's procurement decision that displaced Plaintiff's award and substituted it with a sole-source award.

Defendant would have this Court put on blinders, ignore what the agency itself characterized as corrective action and view this case not as a bid protest but as a garden-variety contract dispute. Such a tack would misconstrue Plaintiff's complaint and seriously compromise the ability of contractors to protest all facets of corrective action as authorized by 28 U.S.C. § 1491(b) and well entrenched precedent. Because Plaintiff clearly has standing to challenge the corrective action here, Defendant's motion to dismiss is denied.

**Plaintiff Has Established Entitlement to Injunctive Relief**

**Success on the Merits**

The Government cites a reduction in budget as the justification for GSA's determination that ABMSI's contract no longer met its requirements, thus prompting its termination of ABMSI's contract for convenience and subsequent award of a sole-source contract for these

services to Premier.[7]   Even accepting that there was a budget cut that applied to ABMSI's contract—a fact Defendant failed to establish—the agency did not have to terminate ABMSI's contract and reprocure the services on a sole-source basis.   AR Tab 47 at 857.[8]   As the Government acknowledged, ABMSI's contract could have been modified to reduce the quantity of services being procured.   Tr. 101-02, June 11, 2014.   The amended solicitation had a clause reserving to GSA the right to "award for all or fewer than all of the number of positions designated on the contract line items in the pricing tables."   AR Tab 10 at 134.   Specifically, the "Terms That Affect Price" paragraph provided:

> The Government is in the process of re-organizing its resources.   As a result, the actual number of positions may change prior to award of the contract.   Thus, the Government reserves the right to award for all or fewer than all of the number of positions designated on the contract line items in the pricing tables.   The Government reserves the right to reallocate Contractor resources within the specified number per labor category from one organization to another.   Any reallocation does not change the total number of hours or the total number of positions.

---

[7]   GSA's reliance on this 30% budget cut that supposedly had to be applied to ABMSI's contract, is not supported by the record.   There is no documentation in the Administrative Record that substantiates the parameters of the budget reduction that had to be applied to the ABMSI contract.   The email communications that discuss the potential need for GSA to reduce its budget on this procurement by approximately 20%-30% constitute the only evidence that GSA was confronted with budget cuts.   But these emails do not specifically address or support a determination that this particular contract had to be cut from 61 to 43 personnel.   The emails initially estimated a generalized budget reduction of 20%, then later, without explanation, shifted the reduction to 30%.   AR Tab 48 at 860; AR Tab 47 at 857.   In her April 24, 2014 declaration, GSA's Contracting Officer testified that no documents exist which respond to "ABMSI's request for all documents containing or reflecting communications with ABMSI or other third parties" discussing what ABMSI termed as the agency's 'plan' regarding GSA's "intent to reduce the staffing levels on ABMSI's contract."   Second Walker Decl. ¶ 6.

This Court requested that the Government provide documentation that a 30% budget cut had to be applied to particular contract actions including the requirement at issue.   The documents the Government produced in response to the Court's order did not establish that any particular budget reduction had to be applied to ABMSI's contract.   Def.'s Notice of Filing, Exhs. B, C, and D (May 19, 2014).   Neither party requested that these documents be added to the record.   However, during this exercise, the Government confirmed that these were the only documents addressing GSA's budgetary reduction and its impact on contracts.   Tr. 19, June 11, 2014.

[8]   The Government initially argued that GSA's reduced requirements amounted to a cardinal change and GSA therefore, needed to terminate ABMSI for convenience, because it could not have secured its reduced requirements under ABMSI's contract.   Def.'s Mot. to Dismiss and Mot. for J. on the AR at 20.   However, at oral argument the Government abandoned its argument that its reduced requirement amounted to a cardinal change.   Tr. 95, June 11, 2014.

AR Tab 10 at 134.

Agency action is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Ala. Aircraft Indus., 586 F.3d at 1375 (alteration in original) (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43). An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Sang-Su Lee, 277 F.3d at 1344 (quotation marks omitted) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43); see also Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962).

Here, GSA failed to articulate a rational connection between the facts found—its need to reduce personnel performing ABMSI's contract—and its choice of terminating that contract and undertaking a new procurement action requiring SBA's evaluation, review, and approval and ultimately fashioning a more expensive,[9] non-competitive sole-source award. The Government acknowledged that ABMSI's contract could have accommodated a reduction in services. Tr. 101-02, June 14, 2011 (conceding the agency could have obtained 43 personnel under ABMSI's contract). Rather than exercise its express contractual right to reduce the number of personnel on ABMSI's contract, GSA, for reasons unexplained in the Administrative Record, terminated ABMSI's contract for convenience and made a sole-source award of the services to Premier at a higher price.

Defendant points to an additional reason that GSA's decision to terminate the ABMSI contract for convenience was justified, citing the agency's concern about the integrity of the award to ABMSI in light of Moody's first protest. The Administrative Record, however, demonstrates that the agency's corrective action addressed the issues in Moody's protest.

In its first protest, Moody's challenged GSA's price adjustments to the contractors' proposals and evaluation of past performance. GSA requested that GAO dismiss Moody's protest, because it was undertaking corrective action, i.e. that it would properly document the past performance evaluation results, request that the contractors realign their pricing, and then revise its price analysis and best value determination in light of the information received.

In taking corrective action, GSA first requested that ABMSI and Moody's submit realigned pricing to reflect the updated contract performance periods. Both contractors promptly submitted realigned pricing. On August 28, 2013, three months later, the Contracting Officer submitted to agency counsel the revised price analysis, stating:

**[…]**

---

[9]   **[…]**. In its award to Premier, GSA attached a list of ABMSI employees that were currently performing the services required under the new 0018 contract, indicating that the same people performing ABMSI's contract would apparently be transferred to Premier and continue performing at a **[…]**% increase in cost. AR Tab 81 at 1127-38.

AR Tab 35 at 678.[10]  GSA's analysis of the contractors' realigned pricing submissions and the agency's revised price analysis addressed and satisfied the first ground of Moody's protest.

In the second facet of the corrective action, GSA completed three analyses of the agency's past performance evaluations between August 28, 2013 and December 12, 2013, and submitted its conclusions to agency counsel for review.  Each submission provided more detail that explained the evaluation team's conclusions as well as a rationale for the final assessment ratings, in response to the concerns of agency counsel.  In each additional past performance analysis, GSA [...].  ABMSI was given a rating of [...] and Moody's was given a rating of [...].  There is no indication in the record that any further action needed to be taken regarding past performance.

After the adjustment for realigned pricing and the submission of the final past performance evaluation report, all that was left for GSA to do to complete the corrective action was make an award.  There is no indication in the record that the award to ABMSI should have been upset based on Moody's protests.  The pricing was realigned satisfactorily, and the past performance evaluation was redone twice again, with no suggestion that there was anything infirm in the agency's assessment.  See Plasan N. America, Inc. v. United States, 109 Fed. Cl. 561, 572 (2013) (quoting Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) (holding that when a court considers a challenge to a past performance evaluation "the greatest deference possible is given to the agency")).  In short, GSA has articulated no legitimate reason for failing to finish corrective action that was very close to completion and instead start over and go to the lengths it did to make a sole-source award to Premier.  AR Tab 40 at 834.  Nonetheless, after nine months, the agency did not complete what should have been a straightforward corrective action.

As a result of the delay, Moody's filed a second GAO protest claiming that GSA failed to complete its corrective action in a reasonable and timely manner.  In response, instead of completing the corrective action and mooting Moody's protest, GSA attempted to settle with Moody's, and, for reasons that are indiscernible on this record, offered to pay Moody's protest costs.  Then, claiming it needed to avoid a gap in service, GSA decided to award a sole source contract for a nine-month period.

Effecting a sole-source award is no easy feat.  In order to promote competition in the procurement process, sole source procurements are subject to a number of restrictions.  Innovation Dev. Enter. of Am., Inc.v. United States, 108 Fed. Cl. 711 (2013).  A sole source-award could not exceed the threshold in 13 C.F.R. 124.506(a)(2)(ii) ("A procurement offered and accepted for the 8(a) [Business Development] Program must be competed among eligible participants if: the anticipated award price of the contract, including any options will exceed $6.5 million for contracts assigned with NAICS codes and $4 million for all other contracts.")  GSA had to reduce both personnel and the contract duration for a nine-and-half-month period (March

---

[10]  However, because Moody's submission did not [...], the agency could predict that Moody's contract prices would [...].  In contrast, ABMSI's submission had been [...].  AR Tab 35 at 680.

21, 2014-December 31, 2014) to meet this threshold, and estimated the cost of procuring this requirement would be $**[…]**.[11]  AR Tab 81 at 1129; Id. at 1117.

In addition, on February 27, 2014, pursuant to FAR Part 10, which requires agencies to conduct market research to arrive at the most suitable approach to acquiring services GSA researched 30 vendors, and determined Premier was the most capable of responding in a short period of time.  AR Tab 67 at 956-61.  GSA then put together a Request for Proposal that it sent to Premier on March 6, 2014.  AR Tab 70 at 989.  Premier submitted its offer to GSA on March 11, 2014, and GSA conducted a past performance evaluation.  AR Tab 73 at 1053-59; AR Tab 75 at 1098-1100.  On March 13, 2014, GSA completed a price analysis of Premier's proposal.  AR Tab 80 at 1117-21.

Additionally, FAR 19.804 required GSA to determine "the extent to which a requirement should be offered in support of the 8(a) Program" by evaluating six factors, including "[w]hether the items or work have previously been acquired using small business set-asides and then offering the requirement to SBA providing information, such as "the names and addresses of any small business contractors that have performed this requirement in the previous 24 months."  FAR 19.804-2.  SBA regulations prohibit SBA from accepting a procurement for award as an 8(a) contract if the procurement will adversely impact an individual small business.  13 C.F.R. 124.504.[12]  Upon the determination that there is not an adverse impact, SBA may accept the agency's offer via a letter.  FAR 19.804-3; AR 1103.  Here, both GSA and SBA in endeavoring to comply with the regulations had to invest significant time and effort to effect this sole-source award—an onerous and unnecessary response to Moody's protests.[13]

The Government argued that GSA's action in terminating ABMSI's contract displacing it with a more expensive sole-source award was "reasonable," and within GSA's discretion.  This conduct, however, went beyond the parameters of agency discretion in the procurement setting.  It is well established that although procurement officials possess considerable discretion, that discretion is not unfettered.  E.g., T &M Distribs., Inc. v. United States, 185 F.3d 1279, 1283 (Fed. Cir. 1999).  The sole justifications articulated by GSA for its termination and reprocurement were invalid; the budgetary cuts and reduced personnel could have been accomplished under ABMSI's contract and concerns about Moody's protest were satisfactorily resolved by GSA's revised pricing and past performance analyses.  Because Plaintiff has demonstrated that GSA's actions in terminating ABMSI's contract and awarding a sole-source

---

[11] Shortening the performance period of ABMSI's contract could have been achieved under "Terms that Affect Price" clause at a lower cost.  A comparison of the same number of personnel (43 employees) and the same time frame (nine months) under a modified ABMSI contract versus the Premier contract yields a cost of $**[…]** by ABMSI and $**[…]** by Premier.

[12] SBA must assess several factors to determine whether the offered requirement has a "presumptive adverse impact."  13 C.F.R. 124.504.  If there is no presumptive adverse impact, then SBA must consider "all relevant factors" to determine whether there would be an adverse impact.  Id.

[13] The Court does not reach ABMSI's allegations that the Government violated FAR 19.804-2(a)(8)-(9) and 13 C.F.R. 124.504(a) and (c).

contract to Premier lacked a rational basis and were arbitrary and capricious, Plaintiff has succeeded on the merits of the protest.

**Irreparable Harm to Plaintiff and Balance of Hardships**

Plaintiff will be irreparably harmed if the termination for convenience and sole-source award to Premier are not enjoined because it lost a contract that represents approximately 38% of Plaintiff's current revenue. Pl.'s Br. 37-39. "Irreparable harm can be shown in the 'form of a lost opportunity to fairly compete for and perform work under the contract, including but not limited to lost profits that would generate therefrom.'" SAI Indus. Corp. v. United States, 60 Fed. Cl. 731, 747 (2004) (quoing Metcalf Constr. Co., Inc. v. United States, 53 Fed. Cl. 617, 645 (2002)).

In consideration of whether the balance of hardships tips in Plaintiff's favor, the Court must evaluate the harm to Plaintiff, Defendant, and Premier. Plaintiff will be irreparably harmed in the absence of an injunction, due to its unwarranted loss of its contract and significant and un-recoupable revenue. The Government will suffer no harm from an injunction as the services will continue to be performed at a lower cost than if performed by Premier, through ABMSI's current contract pending completion of corrective action. Premier will suffer ancillary harm from the loss of anticipated revenue, but its harm is less than that of ABMSI.

Defendant asserts that the hardships to Plaintiff would be "relatively minor because it reasonably only could have expected to perform for a few more months at most" on a contract that it "may not have been entitled to in the first place." Def.'s Mot. to Dismiss 39. This argument is unavailing. That Plaintiff could only have expected to perform for a "few more months" does not obviate the fact that Plaintiff would be losing anticipated revenue. Defendant also suggests that the hardship to the Government would be substantial because it would "waste time and public resources" if required to reevaluate proposals that "no longer reflect the agency's requirements." Id. This argument is not persuasive as the agency already evaluated proposals knowing full well that the personnel could be reduced.

**The Public Interest**

A permanent injunction is properly employed where there is an "overriding public interest" in maintaining the integrity of the federal procurement process. Guzar Mirbachakot Transp. v. United States, 104 Fed. Cl. 53, 68 (2012) (quoting CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 576 (2004)) (citing United Int'l Investigative Servs., 41 Fed. Cl. 312, 323 (1998)). Here, GSA attempted to justify terminating ABMSI's contract and reprocuring via a sole-source award based on two circumstances -- an inconsequential budget cut and an unwarranted concern about Moody's GAO protests. Neither justification supported displacing a competitive award to a service-disabled veteran-owned small business and effecting a noncompetitive higher priced sole-source award. The integrity of the procurement process was compromised by GSA's conduct, and the public interest will be served by injunctive relief.

**Order**

1. The Court **GRANTS** Plaintiff's motion for judgment on the Administrative Record and denies Defendant's cross-motion.

2. The Court **GRANTS** Plaintiff's request for a declaratory judgment and motion for a permanent injunction as follows:

   a. The Court declares that General Services Administration's selection of Premier Management Solutions under Solicitation No. GS-11P-14-YA-C-0018 is null and void, and sets aside the March 13, 2014 selection of Premier.

   b. The General Services Administration, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement and Premier Management Solutions, its subsidiaries, agents and assigns are hereby PERMANENTLY RESTRAINED AND ENJOINED from expending funds on and performing the sole-source award, Contract 0018.

   c. The General Services Administration, its officers, agents, servants, employees and representatives, and all persons acting in concert and participating with them respecting the subject procurement, are ordered to proceed in accordance with statute and regulation to fulfill GSA's requirement for services currently being provided by ABMSI under Contract 0017.[14]   GSA shall complete forthwith its corrective action taken in response to Moody's protests and make a best value determination and award.   In the interim until corrective action is completed, GSA shall keep in place ABMSI's current contract at a personnel level GSA deems appropriate.   In any award resulting from the corrective action/best value determination, GSA may reduce the services procured consistent with its legitimate and documented need to reduce its budget on this procurement.

3. The parties shall file proposed redactions of this opinion by **August 7, 2014**.

4. The Clerk shall enter judgment accordingly.

 s/Mary Ellen Coster Williams

**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[14]  This Court recognizes that ABMSI's first option year soon expires.